CONOVER vs. JEFFREY and wife.

1. In a proper case, equity will look behind a judgment at law, in order to do justice to the parties to it. But where the case is simply that of a judgment creditor who has established his claim at law, seeking in equity to reach his debtor's property, which has been fraudulently conveyed away, the debtor is in no position to contest the creditor's right to his judgment.

2. To such a suit it is no defence that the conduct of the creditor in obtaining an assignment of the bond upon which his judgment was founded, was inequitable.

3. Nor, in such a suit, the complainant's debt having been established at law by verdict and judgment, can the defence be admitted, of an agreement between the obligee in such bond and the obligor, that the latter should be discharged from the bond in consideration of his promise to support the former during his lifetime.

On final hearing, on pleadings and proofs.

*Mr. R. Allen, Jr.,* and *Mr. S. M. Dickinson,* for complainant.

*Mr. B. Gummere,* for defendants.

THE CHANCELLOR.

The bill in this suit was filed by William W. Conover against Richard D. Jeffrey and wife, to subject a certain farm

in Monmouth county to the payment of a judgment recovered by Conover against Jeffrey. The farm was conveyed by Samuel L. Wardell and wife to Jeffrey, in March, 1866. The latter, with his wife, conveyed it, by deed dated June 13th, 1867, to their son Charles, who, with his wife, conveyed it to his mother by deed dated the following day. The judgment was founded on a bond given by Richard D. Jeffrey to his brother, Edmund Allen Jeffrey, on the 12th of March, 1866, in the penalty of $4600, and conditioned for the payment of $2300 in one year from its date, with interest. This bond was assigned by Edmund A. Jeffrey to the complainant on the 24th of August, 1867. Execution against goods and lands was issued on the judgment and returned unsatisfied, before the commencement of this suit.

That the conveyance made by Richard D. Jeffrey and his wife to their son, and that made by their son to his mother, were wholly voluntary and intended to defeat the creditors of Richard D. Jeffrey, the evidence in the cause leaves no room to doubt. Indeed, on the hearing, no question was made on that score by the defendants' counsel. But it was insisted that this court ought to refuse the complainant the relief which he seeks, on the ground that his conduct in obtaining the assignment of the bond was inequitable. The defendants allege that the consideration which he paid was grossly inadequate, being, in fact, only $50, and that Edmund, at the time of making the assignment, was, by reason of long continued habits of intemperance, incompetent to transact business. The testimony in the cause, however, leads me to the conclusion that the conduct of the defendants themselves, in the transfer of the property to Mrs. Jeffrey, was the occasion of the sacrifice in the sale of the bond of which they now complain. That bond was given to Edmund by Richard, to secure to him the repayment of a loan of $2300, or thereabouts, made by the former to the latter. This money constituted Edmund's entire property. It was borrowed by Richard to enable him to pay the cash he had agreed to pay on the purchase of the farm above

mentioned, and he agreed to secure its repayment, with interest, to Edmund, by his bond and a mortgage upon the farm, as soon as he should obtain the title. In the meantime, he gave him the bond above mentioned, which Edmund assigned to the complainant. He did not, when he had obtained title to the farm, give the mortgage, but on application, in behalf of Edmund, while as yet the latter owned the bond, refused to do so. Instead of securing the payment of the money, as he was bound to do, he transferred the title to his property to his wife, to protect the property from Edmund's claim, and to prevent him or any one to whom he should sell or assign the bond, from subjecting the property to the payment thereof. The bond became due on the 20th of March, 1867, and the transfer of the title to the property was made in June of that year. In August following, Edmund sought to sell the bond, complaining that he had been unable to get either principal or interest from Richard, and that the latter had put his property out of his hands ; that he (Edmund) was sick and needed money, but was too poor to engage in legal proceedings for the collection of his debt. He had, indeed, been unable to collect either principal or interest, or to get the promised security. Richard had put his property out of his hands, and Edmund had no money or property except what he had lent to Richard. He was thus constrained to dispose of the bond on the best terms practicable. The result was a sale of it to the complainant for $50, in cash, and the further sum of $450, payable in case, and only in case, Richard had not put his property out of his hands, or the complainant could get him and his wife to secure the claim by mortgage on the property. It appears that Richard had not only transferred the title to the farm to his wife, but with like fraudulent intent, had caused all his personal property to be transferred to her by means of a sale under an execution against him on a judgment which he had paid off, but had kept unsatisfied of record for the purpose of using it as the means of transferring the title to all his personal property to his wife. That Edmund was competent

to transact business when he was sober, is not denied, and the evidence is, that on the occasion of the sale and assignment of the bond, he was, as his legal adviser testifies (and he seems to have had sufficient opportunity to form a reliable opinion), " perfectly sober, and understood himself." Nor is there any evidence of overreaching on the part of the complainant. He does not appear to have sought out Edmund, but the latter first approached him on the subject of the sale. He says that Edmund, when he met him in the street on the day of the sale, told him he had come to sell the bond to him. Nor is there any evidence of any evil practice on the part of the complainant to induce Edmund to sell the bond to him.

But, apart from these considerations, the defendants are in no position to contest the complainant's right to his judgment. The case is simply that of a judgment creditor who has established his claim at law, seeking, in equity, to reach his debtor's property which has been fraudulently conveyed away. It is true, the court may, in a proper case, look behind a judgment at law, in order to do justice to the parties to it, as in a case in 1 *Chan. Cases* 202, where the complainant, when the defendant was drunk, got a bond from him for £800, for a loan of £90, and had recovered judgment at law for the bond. His bill, filed to subject certain property held in trust for defendant's wife, to the payment of the judgment, was dismissed on the ground of the iniquity of his conduct in obtaining the bond. That, however, was a suit between the parties to the loan. The defendants, indeed, both swear that there was an agreement between Edmund and Richard, made both before and after the execution of the bond, that the latter should be discharged from the bond in consideration of his promise to support the former during his lifetime. The proof of this alleged agreement is, it may be remarked, by no means satisfactory. But, were it otherwise, the complainant's debt, having been established at law, by verdict and judgment, this defence cannot now be admitted here. The complainant's debt, with

the costs of this suit, will be charged on the farm, saving, however, Mrs. Jeffrey's inchoate right of dower therein, and in default of payment by a day to be fixed, the farm will be sold to raise the money. There will be an order of reference to a master, to ascertain and report the amount due complainant on his judgment.